**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CURTIS WILLIAMSON, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-12-51 |
| MR. F. B. BISHOP, JR., et al., | * | |
| Defendants. | * | |
| | *** | |

**MEMORANDUM OPINION**

Plaintiff Curtis Williamson ("Williamson") filed the above-captioned Complaint pursuant to 42 U.S.C. §1983.[1] Defendants F.B. Bishop, Jr. and Mr. DeVore, by their attorney, have filed a Motion to Dismiss or, in the Alternative, for Summary Judgment and a Court-directed supplement thereto. ECF Nos. 26 & 50. Plaintiff has responded. ECF No. 28, 30, 31 & 52. After review of the pleadings and applicable law, the Court determines that a hearing is unwarranted.[2] See Local Rule 105.6 (D. Md. 2011). For the reasons that follow, the Motion to Dismiss, construed as a Motion for Summary Judgment, will be GRANTED.

---

[1] Plaintiff subsequently filed a letter with the Court indicating he had been stabbed by another inmate and seeking to expedite his case. ECF No. 15. Defendants were directed to show cause why the relief requested should not be granted. ECF No. 23. Defendants responded (ECF No. 20) and Plaintiff replied. ECF No. 22.

[2] Plaintiff has also renewed his motion to appoint counsel. ECF No. 44. As Plaintiff has previously been advised, a federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1),[2] is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances. See Cook v. Bounds, 518 F.2d 779 (4th Cir. 1975); see also, Branch v. Cole, 686 F.2d 264 (5th Cir. 1982). The question of whether such circumstances exist in a particular case hinges on the characteristics of the claim and the litigant. See Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by Mallard v. U.S. Dist. Court, 490 U.S. 296 (1989). Where a colorable claim exists but the litigant has no capacity to present it, counsel should be appointed. Id. Upon careful consideration of the motions and previous filings by Plaintiff, the Court finds that he has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so. The issues pending before the court are not unduly complicated. Therefore, there are no exceptional circumstances that would warrant the appointment of an attorney to represent plaintiff under § 1915(e)(1).

Plaintiff has also filed a Motion for Extension of Time and Request for Immediate Hearing. ECF No. 45. The motion shall be denied as moot. Plaintiff has filed oppositions to the dispositive motion. There is no need for a hearing in this matter.

**Background**

Williamson, an inmate confined at the Jessup Correctional Institution ("JCI"), alleges that he was held on protective custody from March 3, 2007, until March 23, 2011, after he renounced membership in the prison gang known as DMI. He states he completed renunciation paperwork in 2009-2010 despite the fact that his renunciation puts his life in danger. Williamson alleges that on April 1, 2011, during a case management meeting he discussed this matter at length.

On October 7, 2011, the prison placed all DMI members on lock down. Plaintiff claims he was included in this lock down and forced to lock down with DMI members, placing his life in danger. Plaintiff alleges he was forced to house in the same tier and cell with gang members who sought to harm him and the administration refused to take any action to protect him. ECF No. 1. Subsequent to the filing of the initial Complaint, Plaintiff was stabbed by another inmate. ECF No. 15. He seeks injunctive relief returning him to protective custody housing.[3] ECF No. 1.

Defendants state that Plaintiff was housed on protective custody at Eastern Correctional Institution ("ECI") at his own request after he expressed a desire to leave the Security Threat Group ("STG") Dead Man Incorporated ("DMI"). ECF No. 50, Ex. 1. In 2011, Plaintiff requested that he be taken off protective custody and transferred to the general population at either Western Correctional Institute ("WCI") or the Jessup Correctional Institution ("JCI"), where he indicated he had no enemies. Plaintiff stated in his request that he believed after four years he was no longer in any danger. Id., Ex. 2.

---

[3] By way of amended complaint, Plaintiff seeks good conduct credits and wages he would have earned had he not been required to be housed on protective custody. He also seeks reimbursement of half of the filing fee. ECF No. 25.

Plaintiff states that on March 23, 2011, he arrived at WCI from ECI. He was housed on administrative segregation pursuant to WCI's intake procedures. ECF No. 30. Plaintiff asked to be removed from administrative segregation because he did not have any enemies at WCI and stated he felt he could be safely housed in general population. ECF No. 50, Exs. 3 & 4. After an investigation, Plaintiff was removed from administrative segregation. Id. Ex. 5. Plaintiff states that Defendant Devore, case manager, went through his base file and knew of Plaintiff's affiliation with DMI and the reasons Plaintiff was placed on protective custody for four years. ECF Nos. 30 & 52. Plaintiff states that Devore therefore knew of Plaintiff's "situation and dilemma." He also states that since the Warden and/or Assistant Warden must sign off on all case management decisions Defendant Bishop, the Warden at WCI was also aware of Plaintiff's affiliation with DMI and the reasons for his being housed on protective custody. Id.

Plaintiff states that while housed at WCI he kept "a low profile" among the general population inmates. Id. On October 7, 2011, an incident involving STGs occurred. All inmates considered possible risks to the security of the institution, inmates, or staff were placed on administrative segregation. ECF No. 50, Exs. 6, 7 & 10; ECF No. 30. The lock down included verified STG members such as Plaintiff. Id. Plaintiff states that he immediately wrote letters to Defendants Devore and Bishop as well as to the Security Chief and Assistant Warden. ECF No. 31. Plaintiff states that other inmates who were incorrectly locked down and alerted staff were released from the lock down and returned to their housing and prison jobs. Id. Plaintiff's claims were investigated by Lt. McKenzie, who was unable to locate Plaintiff's renunciation paperwork. ECF No. 50, Ex. 6, 7 & 12; ECF 26, Ex. 3. Plaintiff states he was locked down from October 7, 2011,

3

until February 17, 2012, and lost his dietary job and each month's pay and good conduct credits awarded for working. Id.

Division of Correction headquarters personnel and ECI personnel have found no evidence of Plaintiff's renunciation paperwork other than a letter indicating his desire to begin the process. ECF No. 26, Ex. 2; ECF No. 50, Ex. 1 & 12. Defendants indicate that at the time of the lockdown at WCI he was flagged as a 9/9d[4] inmate, was properly considered a DMI member or associate by staff, and, therefore, was correctly placed on lockdown. ECF No. 50, Ex. 11; ECF No. 26, Ex. 2.

Plaintiff states that when he was transferred to WCI and received his cell assignment he asked whether his cellmate was a member of DMI and explained to Sgt. McIntyre his "situation" and removal from protective custody. Plaintiff states that McIntyre called operations and as a result of the call changed Plaintiff's cell assignment. Plaintiff states that this demonstrates that the administration at WCI had knowledge of his situation and that he could not be housed with DMI inmates. Plaintiff further states that his lengthy stay on protective custody "shows that there is a real threat and the defendants had to know of it." ECF No. 28.

Plaintiff has provided a copy of an inmate request dated January 16, 2012, addressed to Intel Dept. Lt. Malloy, referencing that Plaintiff and Malloy had discussed his "current situation" and Malloy said he was going to remove the security threat group (STG) from plaintiff's name and have him transferred on another administrative segregation unit while awaiting transfer back to ECI, or to transfer him to pre-release. Id., Ex. 1. Malloy responded the following day indicating that the STG label had been removed, but Plaintiff was not eligible to transfer to pre-release. Malloy further indicated he was looking into whether Plaintiff could be transferred to a program at the Maryland

---

[4] Code 9 indicates an inmate is a member of a STG. Code 9d indicates membership in DMI. ECF No. 50, Ex. 11.

Correctional Training Center ("MCTC"). Id. On January 17, 2012, Major Fountain, Commander of DPSCS's Correctional Services Intelligence Coordinating Unit, reviewed Plaintiff's situation and decided to give him the "benefit of the doubt" and remove the 9 and 9d codes from Plaintiff's OBSCIS sheet.[5] ECF No. 50, Ex. 12.

Defendants indicate that on February 17, 2012, Plaintiff was moved from WCI to MCTC due to Case Management's belief that transfer to another institution was in the best interest of the institution and Plaintiff. ECF No. 50, Ex. 10; ECF No. 20, Ex. 2. Defendant Devore avers that he does not recall Plaintiff informing him of his fears. He further avers that transfer is the preferred method for assisting an inmate who claims they are in danger. ECF No. 50, Ex. 10.

On February 20, 2012, Officer T. Calder received a note indicating Plaintiff required medical attention. ECF No. 50, Ex. 13; ECF No. 26, Ex. 4; ECF No. 20, Ex. 3. Calder contacted Lt. Bradshaw, who interviewed Plaintiff. As a result of the interview Bradshaw, "gained knowledge that [plaintiff] was allegedly stabbed at WCI prior to entering MCTC."[6] Plaintiff wrote and signed an inmate statement indicating he had not asked for protective custody upon his transfer to MCTC.[7] ECF No. 26, Ex. 6; ECF No. 20, Ex. 5. Bradshaw escorted Plaintiff to the dispensary where he was examined by Nurse Stone who noted Plaintiff "had five stab wounds on his left shoulder that were

---

[5] Fountain avers that he reviewed Plaintiff's file due to Plaintiff's December 2011 request to DPSCS headquarters. Plaintiff was a validated STG member based on self-admission, letters, and STG documents. Documentation indicating Plaintiff's desire to renounce his affiliation with DMI was located; however, no record of Plaintiff's actual renunciation was found. Based on his previous experience with files initiated prior to his taking over his position and given that he had identified and corrected past inadequate practices, Fountain gave Plaintiff the benefit of the doubt and removed the STG codes. ECF No. 50, Ex. 12.

[6] Plaintiff was last seen by medical staff at WCI on February 3, 2012. He had no stab wounds at that time. ECF No. 50, Ex. 14.

[7] Plaintiff states he did not seek protective custody at MCTC due to his believe that there are officers throughout the Hagerstown region who are affiliated with DMI. ECF No. 28.

5

scabbing over." Id., Ex. 4; ECF No. 20, Ex. 3. The wounds appear to have ben superficial. ECF No. 50, Ex. 15. Plaintiff was placed in administrative custody. ECF No. 26, Ex. 3; ECF No. 20, Exs. 2 & 3.

The following day, Lt. Conley of MCTC's intelligence department interviewed Plaintiff. Id., Ex. 3; ECF No. 20, Ex. 2. Plaintiff stated he was stabbed while housed at WCI, but refused to name his attacker and did not specify when the attack occurred.[8] On the same date, Plaintiff wrote an emergency letter to the Attorney General's Office requesting to expedite his requested transfer to protective custody. Id., Ex. 7; ECF No. 20, Ex 2 & 6. Plaintiff was interviewed by Captain Dicken and revealed the nickname of his attacker as "Double D." Id. Plaintiff refused protective custody when it was offered to him at MCTC. ECF No. 50, Exs. 13 & 18.

On February 28, 2012, Plaintiff filed an emergency letter with this Court indicating he had been stabbed. Id., Ex. 7; ECF No. 20, Ex 6. On February 29, 2012, Plaintiff was transferred to the Patuxent Institution. Id., Ex. 3; ECF No. 20, Ex 2.

**Standard of Review**

A.   Motion to Dismiss

The purpose of a motion to dismiss, filed pursuant to Fed. R. Civ. P. 12(b)(6), is to test the sufficiency of the plaintiff's complaint. See Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts

---

[8] Plaintiff states he refused to give information on the stabbing because there are officers and staff affiliated with the

6

consistent with the allegations in the complaint. Id. at 563. The court need not, however, accept unsupported legal allegations, see Revene v. Charles Cnty. Comm'rs, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, see Papasan v. Allain, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, see United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979).

B.     Summary Judgment

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

The "party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [his] favor without weighing the evidence or assessing the witness' credibility." Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported

---

gang, and revealing such information could get him killed. ECF No. 22.

claims and defenses from proceeding to trial." Bouchat, 346 F.3d at 526 (internal quotation marks omitted) (quoting Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986)).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986), the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." Id. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. See Celotex Corp., 477 U.S. at 322-23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

**Analysis**

A.  Failure to Protect

The gravamen of Plaintiff's Complaint is that his right to be free from cruel and unusual punishment has been violated due to prison officials' failure to protect him from a risk of harm caused by other prisoners. The Eighth Amendment does recognize this right. See Belcher v. Oliver,

8

898 F.2d 32, 34 (4th Cir. 1990).

> As noted by the Supreme Court in Farmer v. Brennan, 511 U.S. 825 (1994),
>
> Prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners. Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.

Id. at 833 (internal quotations and citations omitted). In a failure to protect claim, a prisoner must show, first, that the harm he suffered was objectively serious, and, second, that prison officials acted with deliberate indifference. Id. at 834.

Assuming Plaintiff's superficial stab wounds, which he was able to hide from correctional staff, are considered objectively serious, Plaintiff has failed to satisfy the subjective prong of a failure to protect claim. Deliberate indifference in the context of a failure to protect claim means that a defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. Unless a prison official actually makes this inference, he does not act with deliberate indifference, even where his actions violate prison regulations or can be described as stupid or lazy. Rich v. Bruce, 129 F.3d 336, 339-40 (4th Cir. 1997); see also Lewis v. Richards, 107 F.3d 549, 553 (7th Cir. 1997) ("[T]he fact that an inmate sought and was denied protective custody is not dispositive of the fact that prison officials were therefore deliberately indifferent to his safety.").

As noted, a prison official is deliberately indifferent when he possesses actual, subjective knowledge of an excessive risk of harm to the prisoner's safety and disregards it. Farmer, 511 U.S. at 837-39. There is simply no evidence before the Court that Defendants were deliberately indifferent to Plaintiff's safety. To the contrary, at the time of the lock down there were no facts that a substantial risk of serious injury existed. Plaintiff's file indicated that he was a validated member of a SGT. While Defendants were aware that Plaintiff had been housed on protective custody he was removed from such housing at his own request, had signed a waiver, and made several statements that he could be safely housed at WCI. ECF No. 50, Exs. 3-5. It was not foreseeable that Plaintiff would be endangered by the lock down. There is no evidence that Defendants in fact made the required inference that Plaintiff was in danger. Devore avers that as a Case Manager, he relies on the determinations of investigators and the WCI Intelligence Unit regarding whether an inmate's assignment to segregation or designation as a member of a STG should be changed. Id., Ex. 10. Defendants acted to investigate Plaintiff's claims regarding his alleged renunciation of his gang affiliation, and no evidence was found to support Plaintiff's contention. Additionally, Plaintiff did not mention protective custody or threat from a specific inmate or group of inmates in his claims filed with the Warden. Id., Ex. 7. Rather, Plaintiff claimed that the STG designation should be removed from his file. He complained that he was being improperly punished by his being housed on administrative segregation and sought his return to general population and restoration of his prison job. Id., Ex. 7, pp. 6, 9. He also complained of not receiving hot meals, commissary, and lack of adequate telephone privileges. Id., pp. 13-15. None of the ARPs addressed to the Warden stated Plaintiff feared for his safety or sought protective custody. Id.

The record further demonstrates that Defendants acted to insure that Plaintiff is housed in facilities without known enemies. He was placed on the transfer list to another institution, at his request, prior to suffering injury. ECF No. 50, Exs. 10 & 14. Transfer is an appropriate action to take when an inmate claims he is in danger. Id. Assuming Defendants were aware of a risk of harm to Plaintiff, reasonable efforts were made to avoid the risk. Plaintiff, as the non-moving party, must establish the existence of a genuine issue of material fact by presenting evidence on which a fact-finder could reasonably find in his favor. Plaintiff has failed to submit evidence to support his claim, or to put the material fact of this case--the failure to protect--in dispute. See generally Gray v. Spillman, 925 F.2d 90 (4th Cir. 1991).

B.      Preliminary Injunction

"'[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" United States v. Hardy, 545 F.3d 280, 283 (4th Cir. 2008) (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)). "'The inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.'" Id. (quoting DeFunis v. Odegaard, 416 U.S. 312, 316 (1974)). An actual controversy must exist at all times while the case is pending. See Steffel v. Thompson, 415 U. S. 452, 459 n.10 (1974). Where developments occur during the course of a case which prevent the court from being able to grant the relief requested, the case must be dismissed. See Flast v. Cohen, 392 U.S. 83, 95 (1968). Indeed, "[w]here on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary juridical pronouncements on even constitutional issues

11

obtained . . . ."  See Lewis v. Cont'l Bank Corp., 494 U.S. 472, 480 (1990).  "[O]ne such circumstance mooting a claim arises when the claimant receives the relief he or she sought to obtain through the claim." Friedman's, Inc. v. Dunlap, 290 F.3d 191, 197 (4th Cir. 2002) (citing Broughton v. North Carolina, 717 F. 2d 147, 149 (4th Cir. 1983).

To the extent Plaintiff seeks injunctive relief, his request has been mooted.  Since the filing of the Complaint,  Plaintiff was offered protective custody housing, which he refused.  Accordingly, the Motion for Injunctive Relief shall be dismissed as moot.

C. Administrative Segregation Assignment

In the prison context a liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U. S. 472, 484 (1995).  Following the reasoning of the Supreme Court in Sandin, the Court finds no liberty violation implicated in the decisions associated with Plaintiff's placement on administrative segregation, as it is not atypical for inmates to be placed on administrative segregation for any number of reasons.  See Hewitt v. Helms, 459 U.S. 460, 468 (1983), abrogated on other grounds by Sandin; Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997).   Plaintiff was placed on administrative segregation because he was a  validated member of a STG.  The Court finds there is nothing in the record which shows that the nature of Plaintiff's assignment to administrative segregation comprised the atypical hardships contemplated by Sandin or Beverati.  Therefore, such assignment does not implicate a liberty interest.

D. Prison Job

Likewise, to the extent Plaintiff clams that his assignment to certain prisons and/or protective custody or administrative segregation prevented his ability to be assigned a prison job,

his claim is unavailing.  To show a civil rights violation with respect to a prison job assignment Plaintiff would have to show that the actions taken against him impacted on the exercise of a constitutionally protected right.  Prisoners, however, do not have a constitutionally protected right to work while incarcerated, or to remain in a particular job once assigned.  See Awalt v. Whalen, 809 F. Supp. 414, 416-17 (E.D.Va. 1992); Altizer v. Paderick, 569 F.2d 812, 815 (4th Cir. 1978).  Removing a prisoner from a job simply does not rise to the level of cruel and unusual punishment prohibited by the Eighth Amendment.  See Williams v. Meese, 926 F.2d 994, 998 (10th Cir. 1991).

    For the aforementioned reasons, the Defendants' Motion as supplemented, construed as a Motion for Summary Judgment, shall be GRANTED.   A separate Order follows.

Entered this 20th day of March, 2013

                                                    /s/
                                  George Levi Russell, III
                                United States District Judge